UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MAHESH SHETTY,

                          Plaintiff

        vs.

SG BLOCKS INC., PAUL GALVIN and OASIS, a
PAYCHEX company,

                          Defendant.

Case No. 20-cv-00550-ARR-SMG

**AMENDED MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

RUTA SOULIOS & STRATIS LLP
211 East 43rd Street, 24th Floor
New York, NY 10017
Tel:  (212) 997-4500
Fax: (212) 768-0649

*Counsel for Defendants*

On the Brief: Steven Soulios, Esq.

1

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..................................................................................iii

PRELIMINARY STATEMENT...........................................................................1

STATEMENT OF FACTS...................................................................................3

ARGUMENT.......................................................................................................17

    I.       STANDARD OF REVIEW UNDER RULE 12(B)6................................17

          A.    Where A Conclusory Allegation In The Complaint Is Contradicted By A Document Attached To the Complaint, The Document Controls And The Allegation Is Not Accepted As True............18

              1.   Shetty's Claim That He Was Terminated by the Company is Contradicted by His Own Written Admission that He Quit...18

              2.   Shetty's Allegation that He Never Received Restricked Stock Units of Common Stock is Patently and Knowingly False.....19

              3.   Shetty's Allegation that He Deferred $127,500 in 2017 Bonuses at Galvin's "Demand" Is Flatly Contradicted by the Documentary Evidence.............................................20

              4.   Shetty's Claim of "Outstanding" and "Exemplary" Performance is Refuted By His Own Admission That The Company Did Not Meet Revenue and EBITDA Targets......21

              5.   Shetty's Claim That He Never Received Wage Notices Outlining any Deductions to His Wages is Patently and Knowingly False.............................................21

              6.   There Is No Evidence to Support Shetty's Claim of Legal Fees in the Pizzarotti Action.............................................21

    II.     PLAINTIFF HAS RECEIVED RSU'S IN FULL PAYMENT OF ALL BONSUSES AND COMPENSATION ALLEGED TO BE DUE FOR 2017 AND 2018.......................................................................22

    III.    PLAINTIFF HAS RECEIVED FULL PAYMENT OF HIS COMPENSATION FOR 2019 THROUGH THE DATE OF TERMINATION OF HIS EMPLOYMENT.............................................24

IV.    PLAINTIFF'S EMPLOYMENT AGREEMENT EXPRESSLY
       PRECLUDES A RIGHT TO SEVERANCE...........................................26

V.     ALL CLAIMS AGAINST OASIS FAIL AS A MATTER OF LAW.......27

       A.    Plaintiff Has No Privity Of Contract With Staff One...............27

       B.    The Company's Agreement With Staff One Expressly Precludes
             the Rights of Third Party Beneficiaries.............................28

       C.    Plaintiff's Attempt to Characterize the PEO Agreement Between
             Staff One and SG Blocks As Creating an Employer/Employee
             Relationship Between Staff One and Shetty Fails as a Matter of
             Law................................................................28

             1.    Texas Law Requires PEOs to Share the Right of Direcation
                   and Control over Covered Employees......................29

             2.    Shetty's Allegations Utterly Fail the Economic Reality
                   Test.................................................................31

VI.    PLAINTIFF'S CLAIM FOR RETALLIATION UNDER THE FAIR
       LABOR STANDARDS ACT FAILS AS A MATTER OF LAW.........32

       A.    All of the Alleged Acts of "Retaliation" Occurred Long After His
             Employment Ended...................................................33

       B.    The 8K Was True and Not Retaliatory..............................34

       C.    Admonishing a Litigant that His Actions Are Sanctionable Is Not
             Retaliatory...........................................................35

       D.    SG Blocks Has a Right to Set-off Against Shetty's Claims for
             Indemniciation and Director Fees..................................35

       E.    The Doctrinie of Material Breach Also Precludeds Shetty's Claims
             for Retaliation......................................................36

       F.    None of Shetty's Acts Were Protected Activity....................37

VII.   GALVIN IS NOT SHETTY'S EMPLOYER..............................37

VIII.  DEFENDANTS ARE ENTITLED TO AN AWARED OF ATTORNEY'S
       FEES..................................................................38

CONCLUSION...............................................................38

## TABLE OF AUTHORITIES

<u>CASES</u>

*Albany Medical College v. Lobel,*
    296 A.D.2d 701, 745 N.Y.S.2d 250 (3 rd Dep't. 2002)……………………………36

*Artis v. Asberry*, 2012 WL 5031196, *4 (S.D.Tex 2012)………………………………..32

*Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009)…………………………………………………17

*Amidax Trading Group v. S.W.I.F.T. SCRL,* 671 F.3d 140, 147 (2d. Cir. 2011)………….18

*Awards.com v. Kinko's, Inc.,* 42 A.D.3d 178, 834 N.Y.S.2d 147 (1st Dep't. 2007)…….36

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)……………………………………17

*Benzinger v. Lukoil Pan Americas, LLC,* 2020 WL 1322478, *15 (S.D.N.Y. 2020)……33

*Carter v. Dutchess Cmty. Coll.,* 735 F.2d 8, 12 (2d Cir.1984)…………………………..32

*Citizens Bank of Maryland v. Strumpf,*
    516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995)………………………..35

*Copantitla v. Fiskardo Estiatorio, Inc.,* 788 F. Supp. 2d 253, 302 (S.D.N.Y.2011)…….33

*Gibbs v. New York State Dept. of Taxation and Finance,*
    2009 WL 754307 (E.D.N.Y 2009)……………………………………………………37

*Grace v. Nappa,* 46 N.Y.2d 560, 415 N.Y.S.2d 793, 389 N.E.2d 107 (1979)…..………36

*Gray v. Powers*, 673 F.3d 352, 355–57 (5th Cir.2012)……………..............................32

*In re Merrill Lynch & Co.,* 273 F.Supp.2d 351, 356–57 (S.D.N.Y. 2003)......................18

*Iztep v. Target Corp.*, 543 F.Supp.2d 646, 653 (W.D.Tex.2008)…………………….....32

*Kessler v. Westchester County Dep't of Soc. Servs.,*
    461 F.3d 199, 205–06 (2d Cir.2006)………………………………….......33, 34

*L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d. Cir. 2011)…………..........18

*Markham Gardens L.P. v. 511 9th LLC,*
    954 N.Y.S.2d 811 (Sup.Ct. Nassau Cty. 2012)…………………………………36

*Mullins v. City of New York,* 626 F.3d 47, 53 (2d Cir. 2010)……………………………33

*Nasso v. Bio Reference Labs., Inc.,* 892 F.Supp.2d 439, 446 (E.D.N.Y.2012)................18

*New Windsor Volunteer Ambulance Corps v. Meyers,*
   442 F.3d 101, 117 (2d. Cir. 2006)…………………………………………………36

*Pereira v. Ocwen Loan Servicing, LLC*, 2012 WL 1381193 (E.D.N.Y. 2012)…………27

*Pisane v. Feig,* 41 Misc.3d 216, 970 N.Y.S.2d 363 (Sup.Ct. Kings Cty. 2013)…………35

*Santi v. Hot in Here, Inc.,*
   18 Civ. 3028 (ER), 2019 WL 290145, at *3 (S.D.N.Y. Jan. 22, 2019)…………33

*Tri–State Empl. Servs. v. Mountbatten Sur. Co.,*
   99 N.Y.2d 476, 481, 758 N.Y.S.2d 595, 788 N.E.2d 1023 (2003).......................27

*Waldman v. New Chapter, Inc.,* 714 F.Supp.2d 398 (E.D.N.Y. 2010)...........................27

*Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir.1990)…………………………………32

*Wirtz v. Lone Star Steel Co.,* 405 F.2d 668, 669–70 (5 th Cir.1968)……………………32

## RULES

29 U.S.C. §215(a)(3)…………………………………………………………………33
Fair Labor Standards Act……………………………………………..1, 29, 31, 32, 33, 37
Fed. R. Civ. P. 11……………………………………………………………….....33, 35
Fed. R. Civ. P. 12(b)(6)…….........................................................................................1,17
Texas Labor Code Section 91.032............................................................................19, 30

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MAHESH SHETTY,

                              Plaintiff                    Case No. 20-cv-00550-ARR-SMG

        vs.

SG BLOCKS INC., PAUL GALVIN and OASIS, a
PAYCHEX company,

                              Defendant.

## AMENDED MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants, SG Blocks, Inc. ("SG Blocks" or "Company"), Paul Galvin ("Galvin" and

OASIS ("Oasis") (collectively the "Defendants"), by their undersigned counsel, submit the

following brief in support of their motion to dismiss the complaint pursuant to Fed.R.Civ.P.

12(b)(6).

### PRELIMINARY STATEMENT

Plaintiff commenced this action by filing a complaint on January 31, 2020 ("Initial

Complaint"), against his former employer, SG Blocks, a publicly traded company for which he

serves as a member of the board of directors, as well as  Paul Galvin, the Company's CEO, and

Oasis, the Company's professional employer organization ("PEO"). In the Initial Complaint

Plaintiff raised two employment related claims in Initial Complaint and sought a total of $672,638

1

in damages. Initial Cmplt. ¶55. Specifically, Plaintiff alleges[1] that he is entitled to $372,638 in unpaid wages and bonuses (Initial Cmplt. ¶¶34, 52), and $300,000 in severance pursuant to an Executive Employment Agreement (Initial Cmplt. ¶54). Plaintiff alleges that out of the $372,638, (i) $127,500 is due for a bonus in 2017, (ii) $106,856 in compensation and $75,000 in bonuses for 2018, and $88,282 in compensation for 2019. *See* Complaint (defined below), ¶¶13, 15 and 27,

On March 25, 2020, Plaintiff filed an amended complaint (the "Complaint") whereby he added a $5 million claim for retaliation under the Fair Labor Standards Act ("FSLA") and the New York Labor Law. The only alleged "retaliatory" act that took place after the filing of the Initial Complaint was a letter dated March 12, 2020 sent to Plaintiff by Steven Soulios, Esq., the Company's counsel, written only after numerous demands were made by Mr. Soulios to Plaintiff to cease from communicating with counsel and the Company's directors (and excluding his counsel), and to have his attorney correspond with the Company's counsel and represent his interests. *See* Exhibit 3 to Soulios letter to the Court dated March 26, 2020 (ECF 17).

As set forth below, all of the claims lack merit and should be dismissed with prejudice.

SG Blocks presents herein, and in the exhibits attached to the Declaration of Steven Soulios ("Soulios Decl."), indisputable proof that it has paid the Plaintiff the entire amount of $372,638 in the form of cash and restricted stock units that the Plaintiff agreed to accept in lieu of cash. With respect to Plaintiff's claim for $300,000 in severance, his own employment agreement expressly precludes severance if termination was made during the "Renewal Term." According to the employment agreement, the Renewal Term began on January 1, 2020, and continued until such time as either party terminated the agreement. As such, when Plaintiff's employment ended on August 20, 2020, he was in the Renewal Term and expressly denied severance.

---

[1] Plaintiff is a serial litigant who has been accused of duplicitous and/or tortious conduct by his past two employers. *See* Soulios Decl. ¶¶2-7, 38

Plaintiff's "retaliation" claim is baseless and frivolous. Notably, Plaintiff suffered no adverse employment action because all of the alleged "retaliatory" actions were made long after his employment ended. Equally importantly, the none of the alleged acts taken by Plaintiff – including filing a frivolous claims for wages and bonuses – qualify as "protected activity" under settled retaliation caselaw.

Plaintiff's claims against Oasis, the Company's PEO, should be dismissed as a matter of law because (i) he lacks privity of contract with Oasis, (ii) the agreement between Oasis and SG Blocks expressly precludes any claims by third party beneficiaries such as Plaintiff and (iii) Oasis is not an "employer" under settled law analyzing the grounds upon which a PEO may be held jointly liable for an employee's claim, and Plaintiff's allegations utterly fail the "Economic Reality Test."

Lastly, the claims that Shetty has brought against Galvin also fail because Shetty has offered nothing but an unsubstantiated, conclusory allegation that Galvin controlled SG Blocks' operations. The documentary evidence, including Shetty's own employment agreement establish that Shetty was supervised by and answerable to the Board, not Galvin.

Insofar as Plaintiff's employment agreement with SG Blocks has an attorney's fees provision, the Company is also moving for an award of no less than $75,000 in attorneys' fees, the precise amount of which will demonstrated with itemized billing statements upon the granting of such relief by the Court.

## STATEMENT OF FACTS

Defendant, SG Blocks, Inc., founded in 1993, is a leading designer, innovator and fabricator of container-based structures, and is publicly traded on Nasdaq under the symbol SGBX. *See Cmplt.,* ¶5. SG Blocks transforms shipping containers into state of the art commercial, retail,

3

residential, military and disaster relief structures. *See* www.sgblocks.com. SG Blocks has constructed commercial and retail structures for many major American companies and, including Starbucks, Equinox Fitness, Taco Bell, Lacoste, Puma, and the NBA. *Id.*

On or about January 1, 2017, Plaintiff entered into an employment agreement ("Employment Agreement") with SG Blocks, Inc., whereby he was hired as the Company's Chief Financial Officer. *See* Exhibit 1 to the Complaint. Paragraph 2 of the Employment Agreement provides for an "Initial Term" of two years, to wit, from January 1, 2017 to January 1, 2019. Regarding the term of employment the Employment Agreement further provides:

> After the end of the Initial Term, this Agreement shall automatically renew until either Party provides sixty (60) days' prior written notice of termination ("Renewal Term" and, together with the Initial Term, the "Term").

*See* Employment Agreement, ¶2.

### Shetty Breached The Employment Agreement by Secretly Working for Another Public Company While He Was Contractually Bound to SG Blocks and Otherwise Owed it Fiduciary Duties

The Employment Agreement required Plaintiff to:

> "devote substantially all of Executive's time, energy, skill and best efforts to the performance of Executive's job duties, as assigned by the Company, and to the business of the Company, and shall perform such duties as assigned by the Company…" and

> "not (a) work on any basis (including, without limitation, part-time or as an independent contractor) for a Competing Business (as defined in Section 5(a)); (b) participate in any way in any other business that is not a Competing Business to the extent that such participation adversely affects Executive's performance of Executive's job duties for the Company or that may or does adversely affect the Company in any way."

*See* Employment Agreement, ¶1. Not only was Shetty subject to statutory and contractual duties of loyalty as an executive officer of the Company, he was also a member of the Company's Board of Directors at the time he executed the  Employment Agreement (and still is) and thereby owed the Company and its shareholders fiduciary duties. *See* Exhibit 10 to the Soulios Decl., at pp. 7-8.

4

On January 10, 2020, by Shawn K. Brown ("Trustee"), as the Chapter 7 Trustee of the bankruptcy estate of PFO Global, Inc. ("PFO Global")  filed a complaint ("PFO Complaint") against Shetty in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. Soulios Decl. ¶2. In the PFO Complaint, at ¶17, the Trustee alleges that Shetty was PFO's Chief Research Officer, Principal Financial Officer, and Financial Consult from 2015 until he resigned in June 2017. According to the PFO Complaint, Shetty, as an officer who owed fiduciary duties to PFO Global, conspired with Hillair Capital Management, L.P., PFO's largest secured creditor, and its affiliate, Hillair Capital Management, L.P. ("Hillair"), to seize PFO's assets and use the assets to start a new company. *See* PFO Complaint, ¶3. The Trustee brought claims  against Shetty and other officers and directors of PFO Global for breaching their fiduciary duties of care and loyalty, gross negligence, and usurping PFO's corporate opportunities. *See* PFO Complaint, ¶¶1, 21, 118.

The Trustee has further alleged that  "Hillair demanded that Timothy Kinnear be relieved of his duties as CFO of PFO Global" and that "the Directors, in coordination with Hillair and at Hillair's insistence, hired Mahesh Shetty as Financial Consultant and Chief Restructuring Officer, and then later he was appointed as CFO. *See* PFO Complaint, ¶63. The Trustee has further alleged that "Shetty was affiliated with Hillair. Shetty had  served in similar roles in other companies in which Hillair invested. Shetty's interests were not aligned with PFO's." *See* PFO Global Complaint, ¶64.

The Trustee has further alleged that "the Directors caused PFO to move the Court to re-employ Mahesh Shetty at a yearly salary of $300,000. The Directors worked with Hillair to re-employ Shetty. Paying Shetty such a salary provided absolutely no benefit to PFO, its creditors, or shareholders, and Shetty was Hillair's hand-picked CFO, who was there to act in the best

interests of Hillair and NewCo rather than PFO, its shareholders, and creditors." *See* PFO Global Complaint, ¶104.

In his answer to ¶104 of the PFO Global Complaint, Shetty admitted that after PFO Global filed for Chapter 11 on January 31, 2017,  PFO's "Directors caused PFO to move the Court to reemploy Mahesh Shetty at a yearly salary of $300,000." *See* Shetty Answer to PFO Global Complaint, ¶104, attached to the Soulios Decl. as **Exhibit 2**.

In response to a questionnaire presented to SG Blocks by its Directors and Officers insurance carrier, Shetty, on April 14, 2020, made the following representations about himself:

> "From December 2015 to June 2017, Mr. Shetty served as the Chief Restructuring Officer and Principal Financial Officer for PFO Global, Inc., an innovative manufacturer and commercial provider of advanced prescription lenses."

*See* Exhibit 3 to the Soulios Decl.

**Hillair's Involvement With SG Blocks**

Shetty only joined the board of directors of the Company at the strong urging of the Company's then lender and shareholder, Hillair. Galvin Decl.¶2.   At the time that Hillair recommended Shetty for a seat on the Company's five member board of directors ("Board") it had designated two other directors, to wit, Neal Kaufman and Sean McAvoy, as members of the Board. Galvin Decl.¶2.  Shortly after Shetty was appointed to the Company's Board, Hillair urged and succeeded in having Shetty hired as the Company's CFO. Galvin Decl.¶3.  From January 2017 to June 2017, Shetty was employed as a senior executive officer for two public companies, to wit, SG Blocks and PFO Global.  Neither Shetty nor Hillair (Kaufman and McAvoy) informed the Company that Shetty was working full time for PFO Global at $300,000 per year while he was also working full time as CFO for the Company with a base salary of $180,000 (plus other significant bonuses, option grants, and fringe benefits). Galvin Decl.¶5.

**Liquidity Issues in 2018 Caused Shetty and Galvin to Voluntarily Defer Compensation**

In or about 2018 and 2019 the Company experienced liquidity issues, caused in large part by the breach of a multi-million dollar contract by a counterparty to a construction project. Galvin Decl., ¶6. As a result, Shetty recommended to Galvin and the Company's Compensation Committee that both he and Galvin defer their respective salaries. Galvin Decl., ¶7. Specifically, by emailed dated January 20, 2019, Shetty wrote to Richard Moore ("Moore"), then the Chairman of the Company's Compensation Committee, concerning salary arrears owed to him and Galvin, stating "Salary arrears 2018 – ***Paul and I deferred salary to preserve cash flow***." *See* **Exhibit 11** to the Soulios Decl. (emphasis added). In that same email Shetty noted that while the Committee had previously approved a performance bonus for 2017, "management did not take it to preserve cash flow." *Id.*

On February 27, 2019, Moore wrote to Shetty, copying the other two Compensation Committee members Christopher Melton and Balan Ayaar (but notably excluding Galvin from the communication) and stated:

> As we consider ***your recommendations*** that include granting RSUs, we wanted to understand the tax implications for employees. Do you intend for employees to pay tax on the RSUs as granted – or have you and Thompson Hine put a structure in place for deferring the tax? I would hate to make grants and then have the employee surprised with a tax bill.

*See* **Exhibit 12** to the Soulios Decl. Thompson Hine was the Company's outside corporate and securities counsel at that time. Galvin Decl., ¶9. Shetty engaged Thompson Hine to structure and draft a stock incentive plan for the Company and form restricted stock unit ("RSU") agreements pursuant to which the Company could issue common stock to officers, directors, employees and consultants. *Id.*

7

Contemporaneous with the aforementioned emails between Shetty and Moore, the Compensation Committee met three times in the winter of 2019, to wit, February 12, 2019, February 26, 2019, and March 22, 2019 to consider "year-end SGBX 2018 compensation and the establishment of compensation for 2019" and the use of RSUs as a method of payment. *See* "Minutes of the Compensation Committee for February 12, 2019; February 26, 2019; and March 22, 2019," (hereafter the "2019 Compensation Minutes") attached to the Soulios Decl. as **Exhibit 13.** The Compensation Minutes reflected the following pertinent actions and resolutions of the Committee:

(i)     At the March 22, 2019, the Committee re-evaluated the year-end 2018 compensation *in light of the Company's current liquidity situation*; a decision was made that all year-end, deferred, and special retention compensation would be made in the form of the Company's RSUs based on the closing price of SGBX on February 26, 2019 (emphasis added);

(ii)    The Committee approved management recommendation for 2018 bonuses for seven (7) employees and/or consultants, all of which were to be paid in RSUs;

(iii)   For the two executive officers of the Company, Paul Galvin and Mahesh Shetty, the Committee approved bonus payments of $93,624 and $75,000, respectively. These payments are based on 25% of target bonus amounts and will be paid in RSUs.

(iv)    The Committee will meet with each of Mr. Galvin and Mr. Shetty to provide and evaluation of their performance during 2018; the evaluation of Mr. Shetty will be made in coordination with the Company's Audit Committee. While the Committee recognized that the Company's performance in 2018 *did not meet the established goals and expectations*, it was impressed by the commitment in time and resources given to the Company by Mr. Galvin and Mr. Shetty, including the voluntary deferral of a significant portion of their cash compensation (emphasis added);

(v)     *The Committee did approve the payment of 2018 base salary amounts that Mr. Galvin and Mr. Shetty had voluntarily chosen not to receive as earned. These amounts are $110,400 and $106,856, respectively, and will be paid in RSUs.*

(vi)    The Committee discussed and approved a Special Retention Bonus for each of Mr. Galvin and Mr. Shetty; the additional bonus would in recognition of their contributions to the Company, *including the voluntary deferral of a significant portion of their 2018 cash compensation*. The Special Retention Bonus payments

8

are $127,500 for each of Mr. Galvin and Mr. Shetty and are to be paid in RSUs. The special incentive bonus payments will vest in three equal annual installments commencing December 31, 2020 and will be delivered within 90 days of when the individual is no longer employed by SGBX.  The RSUs become fully vested in full if Mr. Galvin or Mr. Shetty is terminated by the Company without Cause.

**Exhibit 13** to Soulios Decl. (emphases added)

On April 12, 2019, Moore emailed Shetty, copying Committee members Melton and Ayaar (and again excluding Galvin), to inform him that the Committee had acted on Shetty's recommendation and had approved the issuance of RSUs to, *inter alia*, Shetty and Galvin in full payment of deferred salaries, bonuses and special retention bonuses for 2017 and 2018. *See* **Exhibit  14** to the Soulios Decl.  Moore attached to his April 12, 2019 email to Shetty the 2019 Compensation Minutes. *Id.*

The aforementioned determinations by the Committee about the method by which the Company would pay its executives and employees, including Shetty and Galvin, were reflected in the Company's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 filed on April 25, 2019, a copy of which is attached to the Soulios Decl. as Exhibit 10 (and which Shetty voted in support of).

On or about August 16, 2019, Shetty and the Company executed two RSU  agreements whereby Shetty was awarded 67,353 and 47,222 shares, respectively.   *See* **Exhibits 5** and **6** to the Soulios Decl.

### Facts Surrounding Shetty's Separation from SG Blocks

Plaintiff alleges that he was terminated on August 20, 2019. *See Cmplt.,* ¶5. However, the documentary and testimonial evidence completely refutes that allegation. Specifically, in or about July, 2019, Shetty and Galvin were continuing to defer part of their salaries to help the Company's cash flow situation. Galvin Decl., ¶11; *see also* March 2019 Compensation Minutes. The Company

9

was suffering from the effects of two large projects that Shetty was spearheading that were not performing and which deprived the Company of much needed operating funds. Galvin Decl., ¶11. In or about late July, 2019, Shetty and Galvin went to a restaurant in midtown Manhattan to discuss Company business, including some of the failing projects that Shetty was responsible for. Galvin Decl., ¶12. During the lunch meeting Shetty became very animated as he complained about his dire financial condition, and that due to the stress he was under he was "taking f-ing blood pressure medication." Galvin Decl., ¶12.  An argument ensued about Shetty's responsibility for his and the Company's financial condition, at which time he told Galvin "keep your f-ing company, I quit" and abruptly left the restaurant.  Galvin Decl., ¶13. Shetty and Galvin spoke by phone the next day and he reiterated what he told Galvin in the restaurant, namely, that Galvin should find a new CFO for the Company. Galvin told him that he accepted his resignation. Galvin Decl., ¶13.

On or about August 20, 2019, Shetty and Galvin were discussing some of the Company's legal matters. During the conversation Shetty reiterated to Galvin on the phone what he previously told him at the restaurant in Manhattan just weeks earlier, namely, that he was quitting SG Blocks and that Galvin "should find another CFO." Galvin Decl., ¶14.  He confirmed what he told Galvin orally in an email he sent to Galvin later that same day, writing "*__Like I said, get a new CFO__*," to which Galvin responded "**Accepted, this is the 3ʳᵈ time and it is accepted.**" Shetty replied to Galvin's acceptance of his resignation by stating "*__Good. Thank you__*." Galvin Decl., ¶14; *see also* **Exhibit 3** to the Galvin Decl. (emphases added).

At no time after he executed the RSUs but, prior to his separation from the Company on August 20, 2019, did Shetty ever make a written demand upon the Company for payment in cash of his 2017 bonus, or 2018 deferred compensation and bonus, or to otherwise rescind or cancel the RSU agreements he signed with the Company. Galvin Decl., ¶14. Moreover, the Complaint fails

10

to allege any demand, written or oral, by Shetty after he executed the RSU agreements but prior to his separation from the Company on August 20, 2019.

### Duplicitous and Retaliatory Actions by Plaintiff After He Quit

On or about November 19, 2019, the Company filed a Proxy Statement soliciting votes for, *inter alia*, approval to effect a reverse stock split within a range of one (1) share of common stock for every two (2) to fifty (50) shares of common stock (the "Reverse Stock Split"), and (2) for the approval of an amendment to the Restated Certificate of Incorporation to increase the number of authorized shares of common stock from 25,000,000 to 50,000,000 (the "Authorized Common Stock Increase"). Shetty, as a director, voted with a unanimous Board in support of the Proxy. *See* **Exhibit 15** to the Soulios Decl.

On or about November 26, 2019, the Board, with Shetty, executed a unanimous written consent of the authorizing the Company to file a Registration Statement on Form S-1 authorizing the Company to register certain of the Company's common and preferred stock. *See* **Exhibit 16** to the Soulios Decl.  On or about November 27, 2019, the Company filed Form S-1 Registration Statement offering to sell up to $2.875 million of the Company's common stock (the "November 2019 Public Offering"). *See* **Exhibit 17** to the Soulios Decl. The Company successfully raised approximately $1.5 million from the November 2019 Public Offering, the proceeds of which were essential to the Company's ability to fund its operations. Galvin Decl., ¶16. Shetty, as a director, voted in support of the November 2019 Public Offering, and, as the former Chief Financial Officer, was very well aware of the importance to the Company a successful capital raise was at that time. Galvin Decl., ¶17. The November 2019 Public Offering showed the Company's "Current Liabilities" of $2,048,547. *See* **Exhibit 17** at p. 8. Of that amount, only $88,281.25 was properly

attributed to Shetty's accrued salary for 2019, all of which has since been paid in full as set forth in the spreadsheet attached as **Exhibit 26** to the Soulios Decl. *See* Galvin Decl., ¶20,

On or about November 25, 2019, Shetty filed with the Texas Workforce Commission ("TWC") a wage claim seeking in $397,638 for alleged unpaid wages and bonuses dating back to July 31, 2017.[2] *See* **Exhibit 18** to the Soulios Decl. Of the $397,638 claimed by Shetty with the TWC, $309,356 was paid to him in the form of RSUs for 2017 and 2018 bonuses and deferred compensation.  Shetty failed to inform Galvin, or the Company's financial advisors or auditors at the time that he voted in favor of the S-1 November 2019 Offering that he was contemplating and/or had filed a claim against the Company for nearly $400,000. Galvin Decl., ¶18.

Shetty had a fiduciary duty to both (i) **<u>not</u>** to file a frivolous, baseless and time-barred wage claim against the Company and (ii) to disclose to the Company, its auditors and attorneys, a claim and/or liability that he knew would make the financial information in the November 2019 Public Offering as filed (or to be filed) materially inaccurate. Shetty, who was a signatory to the November 2019 Public Offering, knew that (i) the Company's books had reflected that his 2017 and 2018 bonuses and compensation were paid through RSUs and (ii) the November 2019 Public Offering statement of Current Liabilities did not include the $309,356 claim for unpaid compensation and bonuses for 2017 and 2018 that he had secretly filed with the TWC contemporaneously therewith.

In addition to being totally baseless, his claim for $397,638 for compensation and bonuses dating back more than two years was a gross violation of the Texas Workforce Commission statute of limitations, which limits wage claims to 180 days. "A wage claim must be submitted no later

---

[2] The TWC claim was filed along with a letter from Jaime Ramon, Esq.,  Plaintiff's then lawyer who has since resigned. Although the Texas Workforce Commission stamped Shetty's claim "Received November 25, 2019 Labor Law 2" Ramon's letter was curiously dated January 18, 2019.

than 180 days after the date the claimed wages originally became due for payment. If part of your unpaid wages were due within 180 days, submit a claim only for that part." *See* https://www.twc.texas.gov/jobseekers/how-submit-wage-claim-under-texas-payday-law

As a result of Shetty's time-barred, bad faith and knowingly baseless filing with TWC, the Company filed a fraud complaint with the Texas Workforce Commission. *See* **Exhibit 19** to the Soulios Decl. Plaintiff withdrew the Texas Workforce claim.

### Violations by Plaintiff of the Company's Insider Trading Policy

On or about April 4, 2019, Christopher Melton inquired of the Company's securities counsel, David Watson, about whether he was authorized to buy shares of the Company's stock. Plaintiff was copied on the email. *See* **Exhibit 27** to the Soulios Decl. Watson directed Melton to get clearance on the prospective trade from Plaintiff, stating "Per the Insider Trading Policy, ***you need to formally pre-clear this with Mahesh***. Assuming (1) you've done that; and (2) you've got no material non-public information (I don't know why you would but just to say it), you can trade." (emphasis added)

On or about March 30, 2020 the Company released filed a form 10-K for the fiscal year ending December 31, 2019 along with a form 8K which summarized the Company's Fourth Quarter 2019 financial performance. The form 10K can be viewed here. https://ir.sgblocks.com/all-sec-filings/content/0001213900-20-008003/0001213900-20-008003.pdf. The March 30, 2020, 8K is attached as **Exhibit 28**. The Company also conducted an earnings call on March 30, 2020, at 4:30 p.m. *See* https://ir.sgblocks.com/news-events

According to the Company's Insider Trading policy ("Trading Policy"), which Plaintiff, during his tenure as President and Chief Financial Officer, was in charge of administrating, no

insiders of the Company are permitted to buy or sell the Company's stock during a "regular blackout period." The Trading Policy provides, in pertinent part:

> Except as provided in Section 4, no person or entity covered by this Section 3 may purchase, sell, or donate any securities of the Company during the period beginning two weeks prior to the end of each fiscal quarter and ending upon the completion of the second full trading day after the public announcement of earnings for such quarter (a "regular blackout period").

*See* Trading Policy, attached as **Exhibit 4** to the Soulios Decl. According to the Trading Policy, the Company was in a "regular blackout period" through the completion of trading on April 1, 2020, i.e. the second full trading day after the Company released is earnings for the Fourth Quarter 2019 on March 30, 2020.

On March 31, 2020 at 3:00 p.m., Plaintiff emailed Leslie Marlow, Esq., the Company's securities counsel, and inquired "is there any restriction on Directors selling stock and what information do you need to file the required forms with the SEC and what is the deadline (after transaction) to file such reports." *See* **Exhibit 29**  Ms. Marlow was working on, *inter alia*, the Company's public offering, which was filed on April 1, 2020, and was unable to get back to Plaintiff before the close of business on March 31, 2020. The Plaintiff failed to mention any urgency associated with his inquiry, and in particular, that he was planning on selling Company stock immediately.

Plaintiff sold 1,250 shares of SG Blocks common stock on March 31, 2020. Defendants do not know what time the order was placed i.e. whether it was placed before or after his email to Ms. Marlow. On April 1, 2020, at 10:14 a.m., Hank Gracin, the Company's securities lawyer, wrote to Shetty and informed him that "All Directors are currently under a 'Regular Blackout Period' through the close of business today. I have attached the Trading Policy." *See* **Exhibit 29**. Shetty responded to Gracin's email by informing him that he sold 1,250 shares on March 31, which elicited the following response from Gracin:

14

Are you serious?
With all due respect that is completely irresponsible on your part.
On what planet can any Director sell within 48 hours of an earnings release. It is unheard of.
The Insider Trading Policy is clear, very standard and you are 100% subject to it.
There are ways to break a trade.
I suggest you do that right now.

*See* **Exhibit 29**.  Shetty refused to cancel the transaction. *See* **Exhibit 30**.

The Company's stock closed at $2.06 on March 30 and opened at $3.80. *See* https://finance.yahoo.com/quote/SGBX/history/. Based on the earnings release and other positive information announced about by the Company, over 21 million shares of the Company's stock were traded on March 31. The stock closed at $9.30. Shetty sold 1,250 shares on March 31 at near the height of the market, to wit, $7.32. *Id*.; *see* **Exhibit 30**. Followers of the Company's stock, when they learned that Shetty sold shares during the run up to $9.30, by virtue of his filing a Form 4 (Exhibit 30), expressed outrage.  *See* **Exhibit 31** showing social media posts by traders of the Company's stock, including the following remarks:

- "how the hell did Mahesh Shetty board member sell stock into the rally right in front of a financing? Isnt that illegal????;
- oh deary me.. More insider selling Do they know something we don't? 🤔 ;
- Why were insiders selling.?

**Shetty's Bad Faith Refusal To Resign from the Board**

The Company's by-laws provide the following about service on and removal from the Company's Board:

Each director shall hold office until a successor is duly elected at the annual meeting of the stockholders and qualified or until the director's earlier death, resignation, disqualification or removal.

Any or all directors may be removed, with or without cause, at any time, by vote of the holders of a majority of the shares entitled to vote at an election of directors, or by written consent of the holders of shares pursuant to Section 2.10 hereof.

*See* Sections 3.02 and 3.04 of the Company Bylaws, attached as **Exhibit 32**.

On or about  January 14, 2020, at which time Shetty had a $397,000 wage claim  against the Company pending before Texas Workforce Commission ("TWC") Shetty wrote to the Board and stated:

> "As requested before, I also want to explore what the Board wants my ongoing role to be. As all of you know, I served as President and CFO until my termination last year. ***I will defer to the Board's decision on my continuing to serve as a Board member***. I look forward to your response on ***whatever you decide on the Board issue***."

*See* **Exhibit 33** (emphasis added).

On or about January 31, 2020, Shetty commenced the instant action. On or about February 28, 2020, the three independent members of the Board wrote to Shetty and informed that it "has concluded that it is in the best interests of the Board and the Company for you to tender your resignation. Please issue same forthwith." *See* **Exhibit 34.** Instead of honoring his prior promise to "defer" to the Board's decision, "whatever it decided," Shetty exploited leveraged his position on the Board as a negotiating tool, using it as a basis to try to settle his employment claims. *See* **Exhibit 33**. On March 4, 2020, the Board issued the following reply to Shetty:

> Your email dated March 3, 2020 to Mr. Melton has been forwarded to the Board for review and response. The Board does not believe that your continued service on the Board is appropriate and has asked for your resignation; a decision you previously indicated you would abide by. Moreover, the Board also does not believe that withholding or conditioning your resignation therefrom upon negotiation and/or settlement of your employment related litigation claims is appropriate. Please tender your resignation forthwith.
>
> Any settlement negotiations concerning your litigation claims must only be had between your attorney and Company counsel. If there is a settlement offer your attorney wants to make please have him contact Mr. Soulios.

*See* **Exhibit 35**.

# ARGUMENT

# I.

# STANDARD OF REVIEW UNDER RULE 12(B)(6)

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a court, generally, must accept as true all factual allegations in the complaint, this tenet is "inapplicable to legal conclusions," and a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 663-64. A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id*. at 678.

In deciding a defendant's motion to dismiss, the Court may consider on any of the following: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under

Rule 201 of the Federal Rules of Evidence." *Nasso v. Bio Reference Labs., Inc*., 892 F.Supp.2d 439, 446 (E.D.N.Y.2012) (quoting *In re Merrill Lynch & Co.*, 273 F.Supp.2d 351, 356–57 (S.D.N.Y. 2003) (internal citations omitted)).

### A. Where A Conclusory Allegation In The Complaint Is Contradicted By A Document Attached To The Complaint, The Document Controls And The Allegation Is Not Accepted As True

The Second Circuit has repeatedly held that "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true."*Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d. Cir. 2011), citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d. Cir. 2011). The Complaint is replete with self-serving, conclusory allegations that are flatly contradicted by documentary evidence, and are otherwise not entitled to a presumption of truthfulness for purposes of a motion to dismiss. The following material factual allegations are not only unsubstantiated by any documentary evidence, they are refuted by it.

### 1. Shetty's Claim That He Was Terminated by the Company is Contradicted by His Own Written Admission that He Quit.

Shetty claims that he was terminated by the Company. *See Cmplt.,* ¶¶24, 89.  However, Defendant has provided documentary evidence demonstrating that in fact Shetty quit, telling Galvin, <u>three times</u>, to "***get a new CFO***," in response to which Galvin said he ***accepted*** his resignation, prompting Shetty to reply "Good. Thank you." *See* Galvin Decl., ¶10. Those are hardly the words of someone who was terminated. As such, Shetty's allegation that he was terminated should not be accepted as true for purposes of this motion to dismiss.[3]

### 2. Shetty's Allegation that He Never Received Restricted Stock Units of Common Stock is Patently and Knowingly False.

---

[3] However, even if the Court accepts the allegation as true, Shetty is precluded from any right to severance because his alleged termination occurred during the "Renewal Term," for which there is no severance under Section 8(c) of the Agreement. *See* Point IV, *infra*.

Although Shetty does admit that he agreed to defer a 2017 bonus of $127,500, and $106,856 in compensation and $75,000 in bonuses for 2018 (totaling $309,356), and to accept 114,575 shares in full satisfaction thereof, falsely alleges "these RSUs were never actually issued to Plaintiff as required after his termination" and that "he ***never received restricted stock units of the common stock***." *See Cmplt.,* ¶¶*13,*14, 54.  Prior to making this motion the Company provided Shetty with incontrovertible proof of the falsity of this allegation, and demanded that it be corrected. Specifically, by email dated March 24, 2020, counsel for the Company provided Shetty with unequivocal proof, in the form of a Book Entry Advice executed by the Company's stock transfer agent, establishing that on March 19, 2020, 5,729 shares of the Company's common stock were issued to Shetty.[4] *See* **ECF# 15**; *see also* the Compensation Minutes, and Exhibits 5 and 6 to the Soulios Decl. (containing RSU agreements executed by Shetty and the Company). Accordingly, Shetty's filing of an amended complaint alleging that he "never received the RSUs," in the face of actual knowledge of its falsity, renders it not only frivolous and sanctionable, but tantamount to a fraud upon this Court.

Moreover, Shetty's allegations here are directly at odds with his own certifications of the Company's financial statements and filings with the SEC made after (i) the Company authorized and implemented the RSU program in April 2019 (which he supervised) and (ii) he himself signed RSU agreements on his own behalf, which do not reflect a liability to him for unpaid compensation and bonuses aggregating $309,356.  (for 2017 and 2018). Put another way, if his allegations here about not receiving RSUs in payment for 2017 and 2018 bonuses and compensation are true, than

---

[4] As noted herein, on February 6, 2020, the Company effected a reverse stock split of 1/20. Accordingly, the 114,575 shares initially approved for issuance to Shetty for 2017 and 2018 bonuses and compensation were reduced to 5,729 after the reverse stock split.

he repeatedly lied to the SEC and defrauded the Company's shareholders and directors in filings he made and verified on behalf of the Company after April, 2019. Either way, he is duplicitous.

### 3    Shetty's Allegation that He Deferred $127,500 in 2017 Bonuses at Galvin's "Demand" Is Flatly Contradicted by the Documentary Evidence.

Shetty alleges that "during his employment in 2017, Plaintiff deferred $127,500 in bonuses *at the Defendant Galvin's demand*." *See Cmplt.,* ¶13. However, the documentary evidence establishes that the exact opposite is true. It was Shetty who recommended to Richard Moore, Chairman of the Compensation Committee, that in order to help with cash flow issues that the Company issue RSU's in lieu. The record demonstrates that Shetty, without Galvin's involvement, recommended the idea to the Compensation Committee and otherwise initiated and oversaw the formation and establishment of the Company's RSU program – spanning several months – not the least of which required Shetty to engage with the Company's outside counsel Thompson Hine LLP. If Galvin truly  "demanded" that Shetty accept RSUs in lieu of cash, why did Shetty write to Moore (excluding Galvin) and state:

> "Bonus 2017 – the Committee has already approved, but management did not take it to preserve cash flow";

> "Salary arrears 2018 – Paul and I deferred salary to preserve cash flow…";

> "*I* would like to convert them (i.e. new employee options) to RSU's and have sent an email to Shane for counsel…"

Furthermore, if there was any truth to Shetty's allegation, why would Moore write to Shetty on February 27, 2019, copy the other Compensation Committee members and exclude Galvin, and say "As we consider *your recommendations* that include granting RSUs… *See* **Exhibit** 12 to the Soulios Decl.

### 4.    Shetty's Claim of "Outstanding" and "Exemplary" Performance is Refuted By His Own Admission That The Company Did Not Meet Revenue and EBITDA Targets.

Shetty self-servingly alleges that his "performance was so good in 2017 and 2018 that he earned $202,500 in performance bonuses pursuant to the Executive Employment Agreement." *See Cmplt.,* ¶23. However, by his own admission, the Company "did not meet targets for revenue and EBITDA…" for 2018. *See* January 20, 2019, email to Moore, attached as Exhibit 1 to the Galvin Decl. Moreover, in the 2019 Compensation Minutes, the Compensation Committee expressly stated that "Company's performance in 2018 did not meet the established goals and expectations." A bonus was nonetheless awarded to Shetty (and Galvin) in recognition of their "commitment in time and resources given to the Company"…. "including the ***voluntary deferral of a significant portion of their cash compensation***." *See* **Exhibit 13** to Soulios Decl..

5.  **Shetty's Claim That He Never Received Wage Notices Outlining any Deductions to His Wages is Patently and Knowingly False**.

Shetty alleges that he "never received wage notices outlining any deductions to his wages." *See Cmplt.,* ¶¶*28,* 75.

Prior to making this motion the Company provided Shetty with incontrovertible proof of the falsity of this allegation and demanded that it be corrected. Specifically, by email dated March 24, 2020 (see **ECF#17**), counsel for the Company provided three years' worth of paystubs that the Company's professional employer organization, Oasis, issued to Shetty. *See* **Exhibits 20-25** to the Soulios Decl. Shetty refused to acknowledge that his allegation was utterly baseless, rendering the continued presence of it in the record it frivolous and vexatious.

6.  **There Is No Evidence to Support Shetty's Claim of Legal Fees in the Pizzarotti Action**.

Shetty alleges that he has been "been forced to incur substantial legal expense in defending against the claims against him" in the Pizzarotti action. *See Cmplt.,* ¶50. On December 4, 2019, the Hon. Gerold Lebovits, J.S.C. entered an order relieving Thompson Hine LLP as counsel to

Shett in the Pizzarotti and directed Shetty to appoint a substitute attorney within 30 days of receipt

from Thompson Hine of a notice ("Notice To Appoint Substitute Counsel") directing same, and

for such new counsel to file a notice of appearance in the case within 30 days of the service of

Notice To Appoint Substitute Counsel. *See* **Exhibit 36**. Thompson Hine served Shetty with the

Notice To Appoint Substitute Counsel on December 6, 2019. *See* **Exhibit 37**. No attorney has

entered an appearance in the Pizzarotti case on behalf of Shetty in the near five months since Shetty

received the Notice To Appoint Substitute Counsel. Indeed, Shetty's counsel was initially retained

to represent Shetty in the Pizzarotti action but has failed to appear in the case on his behalf. It is

not possible to incur substantial legal fees in a litigation matter for which you have ***no counsel***.

Accordingly, Shetty's allegation that he has "been forced to incur substantial legal expense in

defending against the claims against him" should not only be rejected, but be seen as further

evidence of a lack of candor with this Court.

## II.

### PLAINTIFF HAS RECEIVED RSU'S IN FULL PAYMENT OF ALL BONUSES AND COMPENSATION ALLEGED TO BE DUE FOR 2017 AND 2018

For the reasons set forth in Point I.A.(2) and (3), it is undisputed that Shetty has been paid

in full, in RSUs that he not only personally agreed to receive (and is contractually bound by) but

supervised and implemented for the entire Company. It is quite obvious what Shetty is doing with

this claim. He, like all shareholders, including Galvin, the current and former directors of the

Company, most of whom have devoted substantial time and money to better the Company, does

not like the fact that the Company effected a reverse split of 1/20 on February 6, 2020. Shetty went

from having  114,575 shares of common stock to 5,729. **See Exhibits** 7 and 8 to the Soulios Decl.

Nonetheless, the reverse split was duly authorized by the Board and beneficially resulted in the

Company regaining its Nasdaq listing. *See* **Exhibit 9** to the Soulios Decl.

Shetty's claim is an end run around the Restricted Stock Unit agreements that he entered into with the Company because he now, quite selfishly, with hindsight as his guide, prefers to have the cash instead of the stock. Imagine if every owner of an option or put contract, or stock purchase agreement, involving a publicly traded company could simply change their mind and breach the terms of the contract because the value of the stock declined? How would all of the other SG Blocks employees and consultant who received RSUs in lieu of cash, at Shetty's direction no less – and shareholders generally who saw their stock go through a reverse 1/20 split - feel if Shetty were able to manipulate system for his own selfish gain? It is an absurd and reprehensible ploy that Shetty is foisting onto this Court. Indeed, if Shetty did not receive the RSUs – as he falsely alleges – then his only true remedy would be to sue the Company to compel it to transfer the shares, undoubtedly the course Shetty would have taken had the stock skyrocketed to $100/share. Aside from the undisputed fact Shetty has received the RSUs in full payment for his 2017 and 2018 bonus and compensation claim[5], he has no legal right whatsoever to demand that he be given the cash value of those amounts. He makes no effort in his complaint, nor can he, to demonstrate – with specific factual allegations – why the RSU agreements he executed personally (and implemented company-wide) should be rescinded. What makes Shetty's tactic particularly repugnant is that he signed off on Company financial and proxy statements (in April 2019) and that were filed with the SEC, and public market at large, wherein he represented himself as someone who was trying to help the Company by deferring salary and taking RSUs in lieu of cash. *See* **Exhibit 10** to the Soulios Decl, "Executive Compensation," at pp. 20-21.

---

[5] The Company has learned that Shetty has since moved the shares to another brokerage account.

For the foregoing reasons, to the extent Shetty's First, Second and Fourth causes of action seek payment for alleged unpaid bonuses for 2017 and 2018, and compensation for 2018, they should be dismissed with prejudice.

### III.

### PLAINTIFF HAS RECEIVED FULL PAYMENT OF HIS COMPENSATION FOR 2019 THROUGH THE DATE OF TERMINATION OF HIS EMPLOYMENT

Shetty, whose compensation in 2019 was based on an annual salary $300,000, claims a total $372,638 for alleged unpaid compensation and bonuses. *Cmplt.*¶63. Out of that amount $309,356 was allegedly for a bonus of $127,500 in 2017, compensation of $106,856 in 2018, and a bonus of $75,000 in 2018. As set forth in Point II those amounts were paid in full through RSUs. Once you remove the $309,356 for 2017 and 2018, Shetty is left claiming $63,282 for compensation allegedly due for 2019 through the date of separation on August 20, 2020. However, as demonstrated by Exhibits 23, 24, and 25, Shetty received the following payments after his employment terminated:

**Balance Owed at Separation on 8/20/2019:**                     88,281.25

| Payment Dates | Source | Amount | | Remaining Balance |
|---|---|---|---|---|
| 11/22/19 | Wire | 25,000.00 | | 63,281.25 |
| 12/31/19 | Staff One | 5,250.00 | | 58,031.25 |
| 1/15/20 | Staff One | 5,250.00 | | 52,781.25 |
| 1/31/20 | Staff One | 5,250.00 | | 47,531.25 |
| 2/15/20 | Staff One | 5,250.00 | | 42,281.25 |
| 2/28/20 | Staff One | 5,250.00 | | 37,031.25 |
| 3/15/20 | Staff One | 5,250.00 | | 31,781.25 |
| 3/17/20 | Staff One | 31,781.25 | | 0.00 |

Shetty's claim for $372,638, as alleged in *Cmplt.*¶63, differs from his claim of $397,638 filed with the TWC, apparently giving effect to the $25,000 payment made to him on November

22, 2019 (even though the spreadsheet he attaches does not reflect that payment). It is important to note that said spreadsheet is a copy of the spreadsheet that was filed by Plaintiff's former lawyer in connection with the frivolous Texas Workforce claim (*see* Exhibit 18 to the Soulios Decl.) and that is why it claims a balance of $397,638 instead of the $372,638 alleged in *Cmplt.*¶63.

In letters to the Court on March 16, 2020 (ECF#s 12and 17) the Company demonstrated that all of Plaintiff's deferred compensation due for 2019 had been paid, and that proof of same had been provided to Plaintiff ***before*** he filed the amended complaint on March 25, 2020.  Indeed, the "wages and bonus detail" spreadsheet attached to the amended complaint exhibit (#4) fails to account for the $88,281.25  that was paid ***after*** the spreadsheet cut-off date of August 15, 2019.

It is unfathomable that a party would see fit to haul numerous parties into Federal court, at considerable expense and burden, and press claims that he knows are absolutely baseless, and can be easily disproven with documentary evidence. Defendants submit that it is not acceptable to file a claim alleging $63,282 in compensation relying on an outdated spreadsheet that does not account for $88,281.25 in payments made after the date of the spreadsheet. The proof of payment was provided to Plaintiff's counsel prior to the filing of the amended complaint (although it goes without saying that Plaintiff knew very well that he had been paid $88,281.25  since his employment ended). It was incumbent upon the Plaintiff to properly calculate and account for all payments made against his claim of $63,282 for 2019 compensation, and to refrain from filing a claim that he knew lacked merit. For those reasons, sanctions should be considered by the Court.

For the foregoing reasons, Shetty's First, Second and Fourth causes of action seeking payment for alleged unpaid compensation for 2019 should be dismissed with prejudice.

# IV.

## PLAINTIFF'S EMPLOYMENT AGREEMENT EXPRESSLY PRECLUDES A RIGHT TO SEVERANCE

The very agreement that Plaintiff relies on to support a claim of entitlement to $300,000 in severance, to wit, the Employment Agreement dated January 1, 2017 (see Exhibit 1 to the Cmplt.) actually expressly precludes such a right. Paragraph 8 of the Employment Agreement governs the employee's right to severance and provides, in pertinent part:

8. **Compensation Upon Termination**. Upon the termination of Executive's employment during the Term:

> (c) by the Company for Cause, death or Disability, by Executive for any reason (including, without limitation, any actual or alleged constructive discharge), *or by the Company for any reason during the Renewal Term*, Executive shall only receive the amounts and/or benefits listed in Sections 8(a) and (b), and the Company shall not owe Executive any further compensation. (emphasis added)

Sections 8(a) and (b) only entitle the employee to be paid up until the time of termination and reimbursement of expenses incurred prior thereto (and not to receive severance). Plaintiff alleges that he is entitled to one year of severance under Paragraph 8(d) of the Employment Agreement (see Cmplt. ¶13); however, by its own terms the Employment Agreement does not allow for same. Specifically, Paragraph 8(c) expressly states that no severance is due if the employee is terminated "by the Company for any reason during the Renewal Term." Paragraph 2 of the Employment Agreement, which has an effective date of January 1, 2017, establishes that the "Initial Term" of the Employment Agreement ran for two (2) years from January 1, 2017 to December 31, 2018, and that a Renewal Term began on January 1, 2019. Thus, there is no disputing the fact that Shetty's termination, allegedly effected on August 20, 2019 (Cmplt. ¶24), occurred during the Renewal Term, thus triggering the superseding and severance precluding effect of

26

Paragraph 8(c).[6] 4 As such Plaintiff is not entitled to severance and his Fourth Cause of Action should be dismissed with prejudice.

V.

**ALL CLAIMS AGAINST OASIS FAIL AS A MATTER OF LAW**

In addition to suing Mr. Galvin personally, Plaintiff also named Oasis as a co-defendant. Oasis is the successor to Staff One, a professional employer organization engaged by the Company to handle the processing of payroll and payment of withholding and payroll taxes. New York courts have defined "a PEO is an entity to which the 'client' outsources its payroll and human resource responsibilities, including payment of wages and employment taxes as well as other employment-related matters." *see Tri–State Empl. Servs. v. Mountbatten Sur. Co.,* 99 N.Y.2d 476, 481, 758 N.Y.S.2d 595, 788 N.E.2d 1023 [2003] )

### A.  Plaintiff Has No Privity Of Contract With Staff One

Plaintiff is not a party to the Company's contract with Staff One (*see* Exhibit 3 to the Complaint), nor is Oasis a party to Plaintiff's employment agreement with the Company. Indeed, Plaintiff does not even allege any privity of contract with Staff One. As such, he lacks privity with Staff One, and can assert no claims against it. *See  Waldman v. New Chapter, Inc.*, 714 F.Supp.2d 398 (E.D.N.Y. 2010)("Under New York law, a party may not maintain a contract action against a party with whom it lacks privity"); *Pereira v. Ocwen Loan Servicing, LLC*, 2012 WL 1381193 (E.D.N.Y. 2012) (granting motion to dismiss of loan servicer because of lack of contractual relationship and privity).

### B.  The Company's Agreement With Staff One Expressly Precludes the Rights of Third Party Beneficiaries

---

[6] For the reasons set forth in Point I.A., *supra*, Plaintiff's conclusory allegation that he is entitled to $300,000 in severance is overcome and refuted by the controlling language of the Employment Agreement itself, and the same is otherwise not entitled to be accepted as true.

Not only does Plaintiff lack any privity of contract with Oasis, the contract between Staff One and SG Blocks expressly prohibits any claims to a right of third party beneficiary, they very type being alleged here by Plaintiff. Specifically, Section X.B (p. 14), entitled "Third Party Beneficiaries," provides: "This Agreement is between Staff One and Client and nothing set forth in this Agreement, whether express or implied, (i) shall create any individual right for any Worksite Employees or any other third parties…"

As a matter of law, the mere description of a "worksite employee" in the agreement between Staff One and SG Blocks to cover SG Blocks' employees, including Shetty, does not thereby bestow on the Company's employees (including Shetty) any legal rights and claims as against Staff One; nor does it create duties owed to the Company's employees by Staff One.

C. **Plaintiff's Attempt to Characterize the PEO Agreement Between Staff One and SG Blocks As Creating an Employer/Employee Relationship Between Staff One and Shetty Fails as a Matter of Law**

In an attempt to establish some nexus between himself and Oasis, so as to forge an employer/employee relationship such that Oasis should somehow arguably become liable for Shetty's claims which indisputably arise under his employment agreement with SG Blocks exclusively. To do so, Shetty relies on the following provisions of the Oasis-SGB Agreement:

> "The Client Service Agreement further provided Oasis with the "right of direction and control over Worksite Employees" and "a right to hire, discipline, reassign and terminate Worksite Employees." Id. at I.A.1-2.
>
> The Client Service Agreement also gave responsibility over "payment of salaries, wages and other compensation due the Worksite Employees" to Oasis. Id. at I.A.1-3.

See Cmplt., ¶¶19-20. However, those provisions must be read in the larger context of the agreement itself, the laws of the State of Texas (which governs the Oasis-SGB Agreement) insofar as they apply to PEOs, and the Fair Labor Standards Act (and Federal decisions enforcing and

28

interpreting the FSLA.[7] As discussed in C.1. below, although Oasis is required under Texas Law to share a right of direction or control over covered employees, Plaintiff has not set forth any evidence, nor proffered any allegation, that Oasis exercised that right.

1. **Texas Law Requires PEOs to Share the Right of Direction and Control over Covered Employees**

Section 91.032 of the Texas Labor Code, which regulates PEOs, places the following contractual requirements on PEOs when contracting with a client like SG Blocks:

> **Sec. 91.032. Contract Requirements**.
>
> (a) A professional employer services agreement between a license holder and a client must provide that the license holder:
>
> (1) shares, as provided by Subsection (b), with the client the right of direction and control over covered employees;
>
> (2) assumes responsibility for the payment of wages to the covered employees without regard to payments by the client to the license holder;
>
> (3) assumes responsibility for the payment of payroll taxes and collection of taxes from payroll on covered employees;
>
> (4) shares, as provided by Subsection (b), with the client the right to hire, fire, discipline, and reassign the covered employees; and
>
> (5) shares, as provided by Subsection (b), with the client the right of direction and control over the adoption of employment and safety policies and the management of workers' compensation claims, claim filings, and related procedures.
>
> (b) Notwithstanding any other provision of this chapter, a client retains sole responsibility for:
>
> (1) the direction and control of covered employees as necessary to conduct the client's business, discharge any applicable fiduciary duty, or comply with any licensure, regulatory, or statutory requirement;
>
> (2) goods and services produced by the client; and

---

[7] Under Section X.E. Texas law applies because SG Blocks has employees that reside in Texas and New York (including former employee Shetty).

(3) the acts, errors, and omissions of covered employees committed within the scope of the client's business.

(c) Notwithstanding Subsection (a)(2), a client is solely obligated to pay any wages for which:

(1) obligation to pay is created by an agreement, contract, plan, or policy between the client and the covered employee; and

(2) the professional employer organization has not contracted to pay.

(d) Each professional employer organization shall disclose the requirements of Subsection (c) in writing to each covered employee.

It is clear that the Oasis-SGB Agreement was intended to model and comply with the Texas Labor Code, Section Sec. 91.032. Yet, a full, contextual reading of the Oasis-SGB Agreement clearly delineates the roles and responsibilities of the two entities vis-à-vis the Worksite Employees. The Oasis-SGB Agreement makes it the responsibility of the PEO to carry out the very unique and purposeful actions of a PEO, namely, ensuring processing of payroll, withholding taxes, administrating health and fringe benefits, and administration of the client's worker's compensation insurance plans. See I.A.4-16.

Quite the contrary, the Oasis-SGB Agreement makes the following substantive employment matters the  responsibility of the Client SG Blocks:

- management of the day to day business operations;

- compliance with any contracts or benefit plans (including employment contracts, bonus plans, commission plans or severance play plans);

- hiring, disciplining, reassigning and terminating the Worksite Employee;

- retaining direction and control over the Worksite Employees as necessary to conduct its business and comply with applicable laws;

- ***any responsibility and/or liability with regard to any expressed or implied employment contract***, including without limitation, any non-compete or other restrictive agreements, that any Worksite Employee has or may claim shall be ***entirely the responsibility and/or liability of Client, and Staff-One shall not be a party to any such agreement***.

30

2. __Shetty's Allegations Utterly Fail the Economic Reality Test__.

An honest reading of the Oasis-SGB Agreement leads to but one conclusion. There is absolutely no basis for Shetty to be arguing that Oasis bears any legal responsibility for his alleged claims of unpaid wages, bonuses, or severance. All of those functions and responsibilities are purely and exclusively the responsibility of the Company. Moreover, noticeably absent from Shetty's claims against Oasis are any allegations that demonstrate that Oasis had anything to do whatsoever with (i) his being hired and employed by the Company, (ii)  the execution of the employment agreement between Shetty and Company, and the assignment of duties and responsibilities thereunder, (iii) the evaluation of Shetty's performance, (iv) the payment (other than the perfunctory service of processing the transfer funds to Shetty based on authorizations given and funds made available by the Company) of Shetty's compensation and bonuses, and (v) his separation from the Company in 2019.

Shetty makes no allegation that Oasis had any substantive involvement in his employment and/or termination from the Company. There is not a single allegation of any interaction between Shetty and Oasis, nor a single email or any documentary evidence whatsoever supporting the extraordinary argument that Oasis should be considered his employer under Federal and Texas law.

Courts in both New York and Texas employ the "economic reality test" to determine whether someone qualifies as an employer under the Fair Labor Standards Act. The test includes: "includes inquiries into: whether the alleged employer (1 ) has the power  to hire and fire  the employees, (2 ) supervised   and controlled employee work   schedules or conditions   of employment, (3 ) determined  the rate  and method  of payment , and (4 ) maintained employment

records." *Artis v. Asberry*, 2012 WL 5031196, *4 (S.D.Tex 2012), quoting *Watson v. Graves*, 909

F.2d 1549, 1553 (5th Cir.1990) (quoting *Carter v. Dutchess Cmty. Coll*., 735 F.2d 8, 12 (2d

Cir.1984); *see also Gray v. Powers*, 673 F.3d 352, 355–57 (5th Cir.2012) (applying same test). In

the context of a joint-employment claim, the Fifth Circuit has also applied a five -factor test, which

considers "the total employment situation" with particular regard to the following questions:

> (1) Whether or not the employment takes place on the premises of the company?;
> (2) How much control does the company exert over the employees?
> (3) Does the company have the power to fire, hire, or modify the employment condition of the employees?
> (4) Do the employees perform a 'specialty job' within the production line?; and
> (5) May the employee refuse to work for the company or work for others?

Id., quoting *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669–70 (5th Cir.1968). "No one factor is

determinative of whether a defendant is an 'employer' under the FLSA." *Iztep v. Target Corp*.,

543 F.Supp.2d 646, 653 (W.D.Tex.2008).

The economic realities of Shetty's relationship with Oasis demonstrates that Oasis was not

Shetty's employer as defined by the FLSA. Plaintiff bears the burden of establishing an

employer—employee relationship under the FLSA, and he has been unable to do so with respect

to Oasis as a matter of law.

## VI.

## PLAINTIFF'S CLAIM FOR RETALIATION UNDER THE FAIR LABOR STANDARDS ACT FAILS AS A MATTER OF LAW

### A. All of the Alleged Acts of "Retaliation" Occurred Long After His Employment Ended

Shetty claims the following acts by the Company constitutes retaliation under the Fair

Labor Standards Act:

- withholding of compensation and director fees;
- the filing of an 8K (Exhibit 6 to the complaint);

- a threat to move for sanctions under Rule 11;
- not indemnifying Shetty in the Pizzarotti matter.

*See* Cmplt., ¶30.

All of the aforementioned allegations took place long ***after*** Plaintiff's employment terminated. Plaintiff alleges none, and can point to no adverse employment action suffered as a result of any of the alleged retaliatory actions. The FLSA provides that it is "unlawful for any person ...to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. §215(a)(3). A plaintiff "must establish a prima facie case of retaliation by showing (1) participation in protected activity known to the defendant, like the filing of an FLSA [or NYLL] lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) ***a causal connection between the protected activity and the adverse employment action.***" *Benzinger v. Lukoil Pan Americas, LLC*, 2020 WL 1322478, *15 (S.D.N.Y. 2020), *citing Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010); *see Santi v. Hot in Here, Inc.*, 18 Civ. 3028 (ER), 2019 WL 290145, at *3 (S.D.N.Y. Jan. 22, 2019) (NYLL and FLSA retaliation claims governed by same standard); *see also Copantitla v. Fiskardo Estiatorio, Inc*., 788 F. Supp. 2d 253, 302 (S.D.N.Y.2011) ("To establish a prima facie case under [the NYLL], the plaintiff must adequately plead that ***while employed by the defendant***, she made a complaint about the employer's violation of the law and, as a result, was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action." (emphasis added); *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 205–06 (2d Cir.2006) (holding that a retaliatory motive must "play a part in the adverse employment action." If the plaintiff makes out a prima-facie case, "the burden shifts to the defendant to articulate a 'legitimate, non-[retaliatory] reason for the employment action.'" *Id., citing* Mullins, 626 F.3d at 53 (quoting Weinstock, 224 F.3d at 42)

(emphasis added). The plaintiff must then produce "sufficient evidence to support a rational finding" that defendants' proffered rationales "were false, and that more likely than not discrimination was the real reason for the employment action." *Id*.

Under Second Circuit precedent, Shetty has failed to make out a prima facie case for retaliation under the FSLA or the NYSHRL. There is no causal connection between any of the alleged acts of protected activity and the adverse employment action. Indeed, there is not even an allegation of an adverse employment action because the alleged acts of retaliation occurred after his employment ended – thus failing to meet the requirement that the adverse action occur "***while employed by the defendant***."

## B. The 8K Was True and Not Retaliatory

The lawsuit filed by Shetty was a material event requiring the Company to file a Form 8K addressing same. The Form 8K, filed on February 21, 2020 (**Exhibit 38**) provided:

> The Company believes the complaint lacks merit as by written agreement the employee agreed to accept restricted stock units of the Company's common stock in full satisfaction and payment of substantially all alleged unpaid wages and bonuses that are claimed in the Action. The Company further maintains that employee's employment agreement expressly disclaims any entitlement to or liability for severance during the employee's renewal term of employment. Prior to the commencement of the Action, the employee had filed a wage claim against the Company with the Texas Workforce Commission claiming $397,638 in unpaid wages and bonuses ("Texas Wage Claim"). The Texas Wage Claim was voluntarily dismissed by the employee upon the Company's filing of a fraud complaint with the Labor Law Division of the Texas Workforce Commission. The Company intends to vigorously defend this action, and as appropriate, seek damages, attorneys' fees, and litigation expenses from the employee.

The Form 8K merely sets forth the Company's legitimate defenses to Shetty's claims and can hardly be characterize as retaliatory. Asserting that Shetty's claims for $300,000 in severance and $372,000 in wages and bonuses to be meritless is simply not retaliatory. If that were the case, every time an employer terminated an employee for cause, and defended itself by raising affirmative defense, it would be engaging "retaliatory conduct." Such an absurd tenet would turn employment

law on its head. Lastly, Shetty can point to no "adverse employment" action suffered as a result of the 8K, and the Company's contentions therein, as his employment ended six months earlier.

## C. **Admonishing a Litigant that His Actions Are Sanctionable Is Not Retaliatory**

The Company maintains that Shetty's conduct in filing a baseless claim for wages and bonuses, initially with the TWC and now here, particularly where his counsel was provided with proof of delivery of the RSUs and proof of payment of all deferred compensation for 2019, is sanctionable under Rule 11. Nonetheless, the legitimate exercise of a procedural remedy provided under the Federal Rules of Civil Procedure can never be retaliatory. Here too there is no causal connection between a prospective motion for sanctions and Shetty's employment.

## D. **SG Blocks Has a Right to Set-off Against Shetty's Claims for Indemnification and Director Fees**

The "right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A'" *Pisane v. Feig*, 41 Misc.3d 216, 970 N.Y.S.2d 363 (Sup.Ct. Kings Cty. 2013) quoting *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). Exercising a legal right to set-off cannot be deemed a retaliatory act.

Plaintiff has had months to retain counsel in the Pizzarotti action and has failed to. Moreover, the appropriate venue to hear and determined Shetty's claim for indemnification and SG Blocks' defenses thereto, is the Supreme Court of New York, in the Pizzarotti action.

## E. **The Doctrine of Material Breach Also Precludes Shetty's Claims for Retaliation**

"When one party commits a material breach of a contract, the other party to the contract is relieved, or excused, from further performance under the contract." *Markham Gardens L.P. v. 511 9th LLC*, 954 N.Y.S.2d 811 (Sup.Ct. Nassau Cty. 2012), citing *Grace v. Nappa*, 46 N.Y.2d 560, 415 N.Y.S.2d 793, 389 N.E.2d 107 (1979). "The non-breaching party is discharged from

performing any further obligations under the contract and may elect to terminate the contract and sue for damages or continue the contract." Id., *citing Awards.com v. Kinko's, Inc.*, 42 A.D.3d 178, 834 N.Y.S.2d 147 (1st Dep't. 2007]; New Windsor Volunteer Ambulance Corps v. Meyers, 442 F.3d 101, 117 (2d. Cir. 2006) *see also Albany Medical College v. Lobel*, 296 A.D.2d 701, 745 N.Y.S.2d 250 (3rd Dep't. 2002).

By reason of Shetty's (i) breach of the RSU agreements, (ii) filing of baseless and frivolous Texas Wage Claim, (iii) failure to disclose to the Company that he had filed a $397,000 wage claim while supporting the filing of an S-1 form (as part of a public offering), (iv) omitting from the Company's financial statements a significant liability to him that he (allegedly) believed existed, (iv) breach of his fiduciary duties to the Company, (v) and the filing of baseless and frivolous Texas Wage Claim, the Company was excused from performing under the indemnification agreement. At the very least, the assertion of such a right is in no way evidence of retaliation. As with all of the alleged "retaliatory" acts Shetty suffered no adverse employment action by reason of the Company's failure to indemnify him in the Pizzarotti case, or to pay his alleged director fees.

**F. None of Shetty's Acts Were Protected Activity**

Filing frivolous and baseless wage claims and lawsuits is ***not*** protected activity under FLSA. *See Gibbs v. New York State Dept. of Taxation and Finance,* 2009 WL 754307 (E.D.N.Y 2009)(finding that the filing of a frivolous complaint is not a protected activity under retaliation analysis.).

## VII.

## GALVIN IS NOT SHETTY'S EMPLOYER

Shetty makes one conclusory and wholly unsubstantiated allegation that Galvin was his employer for purposes of FLSA and NYLL because "he exercised sufficient operational control over SG Blocks' operations." Cmplt. ¶7. There are simply no allegations to support this self-serving allegation, the obvious motive of which was borne out of malice with a transparent intent to harass and annoy Galvin. The Board of Directors hired Shetty, not Galvin. *See* **Exhibit 39**. The Company's Bylaws make it purely the purview of the Board to remove an officer. Specifically, Section 4.2 of the Bylaws provides:

> Each officer of the Corporation shall hold office until such officer's successor is elected and qualified or until such officer's earlier death, resignation or removal. The Board may remove any officer elected or appointed by the Board at any time, with or without cause, by the majority vote of the directors then in office.

*See* **Exhibit 32**. Moreover, Shetty's employment agreement makes clear that his employment and compensation were subject to the Board's evaluation and discretion, not Galvin's. For example, the Employment Agreement required the Board to make the following determinations:

- "certain financial and personal and strategic performance metrics established by the Board" (Section 3(b));
- The Board shall undertake a review of Executive's Base Salary and Discretionary Bonus not less often than annually (Section 3(b)) ;
- a determination of "disability" (Section 7(a);
- Strategic plan objectives set by the Company's Board, including, for example:
  •Effective communication with Company employees, customers, Board and other Company contacts as  determined by Board
  • Effective Company training and personnel management as determined by Board (Exhibit A).

Lastly the documents in the record, particularly the manner in which Shetty presided over the implementation of the Stock Incentive Plan and issuance of RSUs, and the Company's Insider Trading Policy, demonstrate that Shetty reported and was subject to the Board's supervision.

For the foregoing reasons, the Court should dismiss all claims against Galvin individually.

## VIII.

## DEFENDANTS ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES

Section 15 of the Employment Agreement provides:

"the prevailing Party in any legal proceeding based upon this Agreement shall be entitled to reasonable attorney's fees and court costs, in addition to any other recoveries allowed by law."

*See* Exhibit 1 to the Complaint.

The Company estimates that the fees incurred in this proceeding, and in opposing the Texas Workforce claim, are in the range of  $75,000, an itemized (and redacted to exclude privileged information) breakdown of which the Company will submit upon request of the Court.

## CONCLUSION

For the foregoing reasons Defendants, respectfully request entry of  an order dismissing the Complaint with prejudice and awarding attorneys' fees in an amount to be determined by the Court.


Dated:          New York, New York
                April 27, 2019

                                    RUTA SOULIOS & STRATIS LLP


                                    /s/ Steven A. Soulios
                                    Steven A. Soulios
                                    211 East 43rd Street, 24th Floor
                                    New York, NY 10017
                                    Tel:  (212) 997-4500
                                    Fax: (212) 768-0649
                                    Email: ssoulios@lawnynj.com

                                    *Counsel for Defendants*

38